## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
------------------------------ x
DAWN MERRITT,                  :
                               :
         Plaintiff,            :
                               :
v.                             :
                               :
                               :   Civil No. 3:24-cv-798 (AWT)
STATE OF CONNECTICUT WORKERS'  :
COMPENSATION COMMISSION,       :
                               :
         Defendant.            :
                               :
                               :
------------------------------ x
```

### RULING ON MOTION TO DISMISS

Plaintiff Dawn Merritt ("Merritt") has filed an Amended Complaint against her former employer, the State of Connecticut Workers' Compensation Commission (the "Commission"), claiming violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII"), and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60. In Count One, the plaintiff claims that the Commission subjected her to a hostile work environment and disparate treatment because of her race in violation of Title VII. See Am. Compl. (ECF No. 30) at 13-15 (¶¶ 36-46).[1] In Count

---

[1] The Amended Complaint contains several paragraphs that have the same numbers. Compare Am. Compl. at 13-14 (¶¶ 36-46) with id. at 15-17 (¶¶ 36-46). Therefore, at times the court cites to pages within the Amended Complaint and puts the paragraphs on that page to which it refers in parentheses.

Two, the plaintiff brings the same claims under CFEPA. See id. at 15 (¶¶ 47-48). In Count Three, the plaintiff claims that the Commission subjected her to a hostile work environment and disparate treatment because of her sex in violation of Title VII. See id. at 15-17 (¶¶ 36-46). In Count Four, the plaintiff brings the same claims under CFEPA. See id. at 17 (¶¶ 47-48). In Count Five, the plaintiff claims that the Commission subjected her to a hostile work environment and disparate treatment because of her age in violation of CFEPA. See id. at 17-19 (¶¶ 33-44). The Commission moves to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted.

For the reasons set forth below, the defendant's motion to dismiss is being granted.

## I. FACTUAL ALLEGATIONS

The Amended Complaint alleges the following circumstances.

"Ms. Merritt is a member of a protected class, as a woman of mixed race and light Black skin." Am. Compl. ¶ 7. "Ms. Merritt is also above the age of 40." Id. "Ms. Merritt began working for WCC on or about June 30, 2022, as an Office Assistant or Receptionist for the Chairman, Stephen Morelli." Id. ¶ 8. "The office reception area where Ms. Merritt worked was an open office environment where all conversations could be easily overheard by other employees and members of the public,

Id.

"From the outset of Ms. Merritt's employment, and
continuing to the end of her employment, Ms. Merritt was
subjected to discriminatory treatment based on her race/color,
age, and sex." Id. ¶ 9. "Specifically, in the open reception
area of the WCC office, where other employees and members of the
public could overhear, Joanne Crawford, the administrative
educational coordinator, who was a supervisory employee over Ms.
Merritt, asked Ms. Merritt about her age, which made her feel
uncomfortable and singled out due to her age." Id. ¶ 10.
"Stephanie Parrott, a trainer who was also a supervisory
employee over Ms. Merritt, and Debra Prenergast, a secretary who
was also supervisory over Ms. Merritt because of her stature,
tenure, and experience, overheard Ms. Crawford ask Ms. Merritt
about her age." Id. ¶ 11. "After Ms. Merritt responded with her
age, Ms. Parrott remarked, 'I can't believe you're that age!'"
Id. ¶ 12. "This comment embarrassed Ms. Merritt and made her
feel ashamed about her appearance, as if she had to justify her
looks given her age." Id. "Because Ms. Parrott, Ms. Crawford,
and Ms. Prenergast were senior employees at WCC, each had an
independent duty to report this incident, but failed to take any
action after it occurred." Id.

"On another occasion, Ms. Prenergast asked Ms. Merritt,
'Why are you dressing like that?'" Id. ¶ 13. "This comment was

made in reference to Ms. Merritt's contemporary, professional attire." Id. "Ms. Prenergast's remark implied that Ms. Merritt's clothing choices were inappropriate due to her age, race and gender as an older woman of color." Id. "The comment made Ms. Merritt feel self-conscious and unwelcome in the workplace." Id.

"Kailey Townsend, Ms. Merritt's adult daughter, would occasionally visit Ms. Merritt at the office." Id. ¶ 14. "Eric Rentz, a safety supervisor who had supervisory authority over Ms. Merritt, made a discriminatory comment to Ms. Merritt about the dark complexion of Ms. Townsend, in contrast to Ms. Merritt's lighter-skinned complexion." Id. ¶ 15. "Without any context or prior conversation about Ms. Merritt's personal life, Mr. Rentz asked Ms. Merritt in a dismissive tone, 'how many baby daddies do you have?'" Id. ¶ 16. "This racially and gender-charged stereotype deeply offended Ms. Merritt, as it made assumptions about her family structure and implied promiscuity based on harmful racial and gender stereotypes about Black women." Id. "The comment was particularly hurtful because it was made in earshot of other employees and members of the public in the reception area and because of Mr. Rentz's position and authority as a supervisor in the office." Id. "As a supervisor in the office, Mr. Rentz had a duty under WCC policy to report this incident, but did nothing." Id. "The 'baby daddies' stereotype is commonly used to demean Black women by implying

promiscuity and unstable family structures." Id. ¶ 16A.

"Ms. Merritt formally complained about this conduct to Ms. Marie Gallo-Hall, chief law clerk of WCC." Id. ¶ 17. "Ms. Gallo-Hall was the designated person to receive such complaints according to WCC policy." Id. "Ms. Merritt provided the details of each incident and expressed that she felt discriminated against and harassed based on her race, sex, and age." Id. "Ms. Gallo-Hall assured Ms. Merritt that the complaints would be investigated." Id. "Instead of taking effective remedial action, Ms. Gallo-Hall simply responded by forwarding the WCC EEO policies to the WCC staff listserv by email without any context or explanation." Id.

"On or about September 14, 2022, in the open reception area of the WCC office where other employees and members of the public could overhear, Ms. Ligia Pena, health and safety coordinator, a person with supervisory authority over Ms. Merritt, called herself 'a White Cracker.'" Id. ¶ 18. "This racially-charged slur was particularly offensive given Ms. Merritt's mixed-race background and light skin tone." Id. "This remark, made in the presence of Ms. Townsend, came after a conversation of hair products for curly hair." Id. ¶ 19. "This further ties the comment to Ms. Merritt's race." Id.

"Ms. Pena, showing no remorse or recognition of the offensive nature of her comment, then said to Ms. Merritt, 'You

can never be one-hundred percent White trash like me.'" Id. ¶
20. "These comments made Ms. Merritt feel degraded, othered, and
uncomfortable in her workplace due to her race." Id. 20. "The
remarks reinforced harmful racial stereotypes. Id. "Despite
having a duty to report this incident to HR as a supervisory
employee, Ms. Pena failed to report the incident." Id.

   "About one week later, Ms. Merritt reported the 'White
Cracker' and 'white trash' remarks to Ms. Gallo-Hall, the
designated person to receive such complaints." Id. ¶ 21. "Ms.
Merritt explained how these comments were racially offensive and
created a hostile work environment." Id. "At around the same
time that Ms. Merritt made the report, she received a biased
unscheduled performance evaluation, that questioned her ability
to deal with and work with people and the public." Id. "This
evaluation was discriminatory and retaliatory and was given
prematurely, as it was given earlier than would have otherwise
have been expected." Id. "Ms. Merritt put the WCC on notice of
the biased nature of the evaluation." Id. "The timing and
negative content of this evaluation strongly suggest that it was
issued in retaliation for Ms. Merritt's complaints of racial
discrimination." Id. "Given Ms. Merritt's role as a
receptionist, the negative evaluation directly impacted Ms.
Merritt's ability to perform her job and advance in her career."
Id.

"About a week after that, Ms. Parrott approached Ms.
Merritt's desk in the reception area where Victor Maldonado of
the finance department, who was also in a supervisory position
over Ms. Merritt, was also present." Id. ¶ 22. "As Ms. Merritt
was in the process of giving Ms. Parrott Ms. Cheryl Donnelly's
mail, Ms. Parrott loudly exclaimed, while looking Ms. Merritt up
and down, 'Your vagina is hanging out!'" Id. "This crude,
sexualized comment about Ms. Merritt's body and clothing was
extremely embarrassing and degrading, particularly as it was
made in front of a male colleague and could be overheard by
others in the reception area." Id. "The comment, which was
false, . . . made Ms. Merritt feel objectified and uncomfortable
in her workplace." Id. "The incident, which came shortly after
Ms. Merritt's formal complaints about racial discrimination,
further contributed to the hostile work environment and
suggested that the WCC had failed to take any effective remedial
action in response to her previous complaints." Id. "Despite
both Ms. Parrott and Mr. Maldonado having a duty to report this
incident to WCC HR, neither did anything in response to the
incident." Id. "The falsehood of the 'vagina is hanging out'
comment is demonstrated by a contemporaneous photograph of the
dress taken by Ms. Merritt at WCC shortly after the comment was
made." Id. "That same day, Ms. Merritt reported the incident via
email to Ms. Wanda Engermann, personnel officer and to Alexis

Cortez in HR." Id. ¶ 23.

"As a result of this horrendous working environment, Ms. Merritt was constructively discharged from her employment, and began taking PTO." Id. ¶ 24. "As soon as Ms. Merritt took PTO, she provided medical documentation explaining the need for her leave due to the hostile work environment." Id. "Despite WCC being informed that its horrendous working environment was causing injury to one of its own employees, WCC chose to take no further remedial action to accommodate Ms. Merritt or address her concerns." Id.

"After exhausting her PTO, Ms. Merritt took leave under the FMLA." Id. ¶ 25. "Instead of addressing any of Ms. Merritt's concerns, WCC only made requests of Ms. Merritt for additional medical documentation, sometimes requiring her to resubmit paperwork that she had already submitted." Id.

"On October 7, Ms. Merritt formally told WCC HR that she could not return unless the discriminatory conditions of her employment were addressed." Id. ¶ 26. "WCC HR never replied to Ms. Merritt's communication at all." Id. "Ms. Merritt's complaint was echoed by her own doctor's statement." Id.

"On December 14, 2022, Ms. Merritt emailed HR at the WCC again and asked to set up a meeting to discuss her unpaid leave that was coming to an end." Id. ¶ 27. "Ms. Merritt expressed her concerns about returning to the hostile work environment." Id.

"Ms. Merritt provided medical documentation from her doctor detailing the severe anxiety, stress, and depression she was experiencing as a result of the hostile work environment at WCC." Id. "Returning to the same hostile work environment would be detrimental to Ms. Merritt's health." Id.

"HR responded that they had Ms. Merritt returning to work on December 20." Id. ¶ 28. "HR also said that if Ms. Merritt wanted to extend her leave, she needed to submit relevant documentation." Id. ¶ 29. "At that time, however, Ms. Merritt's doctor had already sent a request to extend Ms. Merritt's leave until February 19, 2023." Id. ¶ 30.

"On December 15, despite Ms. Merritt's medical documentation, HR told Ms. Merritt that the extension was approved only to December 27, 2022, or she would need to resign." Id. ¶ 31. "HR made no mention of any steps taken to address the hostile work environment or to accommodate Ms. Merritt's medically-documented concerns." Id. "Ms. Merritt was told by HR that her leave could not be extended further and that her only option was to send in a resignation, which would give her the option of reapplying to the State for employment, but not to the same position." Id. ¶ 32. "Ms. Merritt was experiencing debilitating stress, anxiety, and depression as a result of the hostile work environment at WCC, which was disabling, and provided medical documentation requested by WCC

to substantiate her issues." Id. ¶ 33. "Despite Ms. Merritt putting WCC on notice about her issues, nothing was done to remedy the hostile work environment, and Ms. Merritt was expected to return to work on December 27 without any resolution or remedy." Id. ¶ 34.

"As a result, Ms. Merritt was forced to resign from her employment." Id. ¶ 35. "Faced with the choice of returning to a discriminatory and hostile work environment that was causing her significant health issues or resigning, Ms. Merritt felt she had no choice." Id. "In her resignation letter, she cited the racial and sexual harassment she was enduring, but nothing was done to accommodate her and allow her to stay in employment." Id. "WCC's failure to address the hostile work environment, coupled with its ultimatum to return without any accommodations or remedial measures, amounted to a constructive discharge." Id.

## II. LEGAL STANDARD

When deciding a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). See also Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 86 (2d Cir. 2015) ("[T]he court must assume the factual allegations in the complaint to be true, 'even if [they are] doubtful in fact'. . . ." (citation omitted)). Although a

complaint "does not need detailed factual allegations, a
plaintiff's obligation to provide the 'grounds' of his
'entitle[ment] to relief' requires more than labels and
conclusions, and a formulaic recitation of the elements of a
cause of action will not do." Bell Atlantic Corp. v. Twombly,
550 U.S. 544, 555 (2007) (on a motion to dismiss, courts "are
not bound to accept as true a legal conclusion couched as a
factual allegation" (citing Papasan v. Allain, 478 U.S. 265, 286
(1986))).

     "Nor does a complaint suffice if it tenders naked
assertions devoid of further factual enhancement." Ashcroft v.
Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at
557). "Factual allegations must be enough to raise a right to
relief above the speculative level, on the assumption that all
the allegations in the complaint are true (even if doubtful in
fact)." Twombly, 550 U.S. at 555 (internal quotation marks
omitted). However, the plaintiff must plead "only enough facts
to state a claim to relief that is plausible on its face."  Id.
at 547. "A claim has facial plausibility when the [claimant]
pleads factual content that allows the court to draw the
reasonable inference that the defendant is liable for the
misconduct alleged." Iqbal, 556 U.S. at 678. "The plausibility
standard is not akin to a 'probability requirement,' but it asks
for more than a sheer possibility that a defendant has acted

unlawfully." Id. (quoting Twombly, 550 U.S. at 556). "Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting Twombly, 550 U.S. at 557).

In its review of a motion to dismiss for failure to state a claim, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." Samuels v. Air Transport Local 504, 992 F.2d 12, 15 (2d Cir. 1993).

## III. DISCUSSION

The plaintiff asserts that each of the individuals who allegedly engaged in conduct that was hostile or discriminatory was her supervisor for purposes of imputing vicarious liability to the Commission under Title VII. The factual allegations in the Amended Complaint fail to establish that any of those individuals was her supervisor.

The factual allegations in the Amended Compliant fail to establish a hostile work environment, as claimed in Counts One through Five, based on the plaintiff's race, sex, or age. The factual allegations in the Amended Complaint also fail to establish a claim that the plaintiff was subjected to disparate treatment, as claimed in Counts One through Five, based on her

race, sex, or age.

A. **The Alleged Conduct Was All By Coworkers, Not Supervisors**

The plaintiff asserts that each of the individuals who engaged in conduct that was hostile or discriminatory was "a supervisory employee over Ms. Merritt". Am. Compl. ¶ 10. See also id. ¶¶ 11, 15, 18, 20. The defendant contends that the allegations in the Amended Complaint are conclusory and "insufficient to establish that the co-workers were indeed supervisors". Memorandum in Support of Motion to Dismiss Amended Complaint (ECF No. 33-1) ("Def. Mem.") at 20. The court agrees.

"[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." Vance v. Ball State Univ., 570 U.S. 421, 450 (2013). The plaintiff was hired as "an Office Assistant or Receptionist for the Chairman, Stephen Morelli." Am. Compl. ¶ 8. None of the conduct on which she bases her claims is attributed to him.

The plaintiff argues that the employees in question "controlled Ms. Merritt's working conditions," Plaintiff's Response to Defendant's Motion to Dismiss (ECF No. 34) ("Pl. Opp'n") at 4-5, but there are no factual allegations in the Amended Complaint which could show that any of the employees who allegedly engaged in hostile or discriminatory conduct had authority to take any tangible employment action against the

plaintiff. For example, the plaintiff alleges that Joanne
Crawford made a particular remark and then simply asserts that
Crawford, who was an "administrative educational coordinator,
was a supervisory employee over Ms. Merritt." Am. Compl. ¶ 10.
She does the same with respect to Parrott, alleging that she is
"a trainer who was also a supervisory employee over Ms.
Merritt," and Prenergast, alleging she was "a secretary who was
also supervisory over Ms. Merritt". Id. ¶ 11. Rentz is described
as a "safety supervisor who had supervisory authority over Ms.
Merritt[.]" Id. ¶ 15. Pena is described as a "health and safety
coordinator" who had "supervisory authority over Ms. Merritt".
Id. ¶ 18. These are naked assertions devoid of factual
enhancement suggesting that any of the individuals was a
supervisor to the plaintiff.

   B. **Hostile Work Environment**

      Under Title VII, it is "an unlawful employment practice for
an employer . . . to discriminate against any individual with
respect to his compensation, terms, conditions, or privileges of
employment, because of such individual's race, color, religion,
sex, or national origin." Meritor Sav. Bank, FSB v. Vinson, 477
U.S. 57, 63 (1986) (quoting 42 U.S.C. § 2000e-2(a)(1)). The
"'phrase 'terms, conditions, or privileges of employment'
evinces a congressional intent 'to strike at the entire spectrum
of disparate treatment . . . in employment,' which includes

-14-

requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Sav. Bank, 477 U.S. at 64).

CFEPA provides, in relevant part, "[i]t shall be a discriminatory practice in violation of this section . . . [f]or an employer . . . to discriminate against any individual in compensation or in terms, conditions or privileges of employment because of the individual's race, color, religious creed, age, sex, gender identity or expression, marital status, national origin . . . ." Conn. Gen. Stat. § 46a-60(b). "A hostile work environment claim under CFEPA is examined under the same standards as those governing a hostile work environment claim under Title VII." Payne v. PSC Indus. Outsourcing, Ltd. P'ship, 139 F. Supp. 3d 536, 549 (D. Conn. 2015). See also Little v. R & L Carriers, Inc., No. 3:24-CV-836 (OAW), 2025 WL 744276, at *8 (D. Conn. Mar. 9, 2025) ("Connecticut courts look to federal law for guidance in evaluating discrimination claims under . . . CFEPA, therefore the court shall apply the same standard of review to Plaintiff's Title VII and CFEPA claims.").

"To state a claim for a hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive -- that is, . . . an environment that a reasonable person would find hostile or abusive; (2) creates an

environment that the plaintiff subjectively perceives as hostile
or abusive; and (3) creates such an environment because of the
plaintiff's sex" or other protected characteristic. <u>Patane v.
Clark</u>, 508 F.3d 106, 113 (2d Cir. 2007) (internal quotation
marks omitted). "Proving the existence of a hostile work
environment involves showing both 'objective and subjective
elements . . . .'" <u>Feingold v. New York</u>, 366 F.3d 138, 149 (2d
Cir. 2004) (quoting <u>Alfano v. Costello</u>, 294 F.3d 365, 374 (2d
Cir. 2002)).

"Hostile environment claims are different in kind from
discrete acts. Their very nature involves repeated conduct."
<u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 115 (2002).
"The 'unlawful employment practice' therefore cannot be said to
occur on any particular day. It occurs over a series of days or
perhaps years and, in direct contrast to discrete acts, a single
act of harassment may not be actionable on its own." <u>Id.</u> (citing
<u>Harris</u>, 510 U.S. at 21).

"Isolated acts, unless very serious, do not meet the
threshold of severity or pervasiveness." <u>Alfano</u>, 294 F.3d at 374
(citation omitted). "As a general rule, incidents must be more
than 'episodic; they must be sufficiently continuous and
concerted in order to be deemed pervasive.'" <u>Id.</u> (citation
omitted). "For racist comments, slurs, and jokes to constitute a
hostile work environment, there must be 'more than a few

isolated incidents of racial enmity.'" <u>Schwapp v. Town of Avon</u>, 118 F.3d 106, 110 (2d Cir. 1997) (quoting <u>Snell v. Suffolk County</u>, 782 F.2d 1094, 1103 (2d Cir. 1986)). Title VII "is not a civility code." <u>Pearson v. Bd. of Educ.</u>, 499 F.Supp.2d 575, 592 (S.D.N.Y. 2007) (citing <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 81 (1998)). "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." <u>Harris</u>, 510 U.S. at 21 (quoting <u>Meritor Sav. Bank</u>, 477 U.S. at 65, 67).

"This is not, and by its nature cannot be, a mathematically precise test." <u>Harris</u>, 510 U.S. at 22. "[T]here is neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." <u>Richardson v. New York State Dep't of Corr. Serv.</u>, 180 F.3d 426, 439 (2d Cir. 1999)(alteration in original) (internal quotation marks omitted). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance." <u>Harris</u>, 510 U.S. at 23.

"Once a plaintiff has established the existence of a hostile workplace, she must then demonstrate that the harassing conduct 'which created the hostile situation should be imputed to the employer.'" <u>Distasio v. Perkin Elmer Corp.</u>, 157 F.3d 55, 63 (2d Cir. 1998) (quoting <u>Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.</u>, 957 F.2d 59, 63 (2d Cir. 1992)). "When the harasser is a supervisor, the employer is presumed to be absolutely liable." <u>Id.</u> "However, when the harassment is attributable to a co-worker, rather than a supervisor, . . . the employer will be held liable only for its own negligence." <u>Id.</u> Therefore, "a plaintiff must prove that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." <u>Kotcher</u>, 957 F.2d at 63. "This standard places a reasonable duty on an employer who is aware of a . . . discriminatory atmosphere adversely affecting the emotional well-being and productivity of its employees to take reasonable steps to remedy it." <u>Snell</u>, 782 F.2d at 1104.

A plaintiff who alleges that a hostile work environment resulted in their "constructive discharge . . . must show working conditions so intolerable that a reasonable person would have felt compelled to resign." <u>Penn. State Police v. Suders</u>, 542 U.S. 129, 147 (2004). <u>See</u> <u>id.</u> ("A hostile-environment constructive discharge claim entails something more[.]").

### 1. Race-Based Hostile Work Environment

The plaintiff alleges that a hostile work environment because of her race, in violation of Title VII (Count One) and CFEPA (Count Two), was "evidenced by the following incidents":

> a. The racially-charged comments by Ms. Pena, calling [herself] a "white cracker" and saying [the plaintiff] could "never be one-hundred percent White trash;"
>
> b. Mr. Rentz's racially stereotypical and offensive question about "how many baby daddies" Plaintiff had;
>
> c. Mr. Rentz's discriminatory comment about the skin tone difference between Plaintiff and her daughter;
>
> d. Ms. Prenergast's comment about Plaintiff's clothing, which implied her attire was inappropriate due to her race.

Am. Compl. ¶ 38 (Count One).

Accepting as true the factual allegations in the Amended Complaint and drawing inferences in the light most favorable to the plaintiff, the plaintiff has failed to state a claim for a hostile work environment based on her race.

Although paragraph 38 of the Amended Complaint suggests that there were four incidents, there were only three incidents because the question and the comment by Rentz occurred during the same incident.

The plaintiff provides no context for the alleged comment by Prenergast, "Why are you dressing like that?" Id. ¶ 13. She simply says that it occurred "on another occasion." Id. She alleges that the comment was made in reference to the

-19-

plaintiff's contemporary professional attire. The plaintiff then
asserts that the remark "implied that Ms. Merritt's clothing
choices were inappropriate due to her age, race, and gender as
an older woman of color." Id. But the plaintiff provides no
information about the circumstances surrounding the alleged
remark by Prenergast, and nothing about the remark itself
suggests any connection to the plaintiff's race. Thus, there is
no basis for a conclusion that there is a nexus between this
remark and the plaintiff's race. In addition, this remark does
not qualify as one that is "very serious." Alfano, 294 F.3d at
374. Nor was the remark physically threatening or humiliating;
there is no evidence to suggest that it was anything more than a
mere offensive utterance.

The plaintiff alleges that Pena called herself a "white
cracker" and then said that the plaintiff could "never be one-
hundred percent white trash." Am. Compl. ¶ 38. This remark came
after a conversation about hair products for curly hair. On its
face the remark addresses the plaintiff's race. Drawing
inferences in the light most favorable to the plaintiff, the
remark could be taken as a statement to the plaintiff that she
could never be one-hundred percent white. The plaintiff does not
provide any further information as to the context for or
circumstances surrounding the remark, so there is no basis for
concluding that the incident was one that could be termed "very

-20-

serious," Alfano, 294 F.3d at 374, nor is there any basis for
concluding that the conduct was physically threatening or
humiliating as opposed to a mere offensive utterance.

As to Rentz, he contrasted the plaintiff's complexion to
her daughter's complexion and without any prior conversation
about the plaintiff's personal life, "asked [the plaintiff] in a
dismissive tone, 'how many baby daddies do you have?'" Am.
Compl. ¶ 16. The circumstances suggest that there was a nexus
between the plaintiff's race and the alleged comment. Standing
alone, the comment does not rise to the level of "very serious."
Alfano, 294 F.3d at 374. But while there is no suggestion that
the comment was physically threatening, a finder of fact could
conclude that it was humiliating, as opposed to a mere offensive
utterance.

Thus, drawing inferences in the light most favorable to the
plaintiff, the factual allegations in the Amended Complaint
establish that there was one incident related to the plaintiff's
race that was humiliating, and a second incident related to her
race that was offensive. One involved Rentz and the other
involved Parrot. Neither incident standing alone rises to the
level of being very serious. In addition, taken together, the
two incidents are not sufficiently continuous and concerted that
they establish a pervasive environment; rather, they are no more
than episodic. See Alfano, 294 F.3d at 376.

Therefore, the motion to dismiss is being granted with respect to these claims.

### 2. Sex-Based Hostile Work Environment

The plaintiff alleges that a hostile work environment because of her sex, in violation of Title VII (Count Three) and CFEPA (Count Four), was "evidenced by the following incidents":

a. Ms. Parrott's crude and sexualized comment about Plaintiff's body, loudly exclaiming "Your vagina is hanging out!" in the presence of male colleagues and other employees;

b. Mr. Rentz's gender-stereotypical and offensive question about "how many baby daddies" Plaintiff had, which implied promiscuity based on harmful stereotypes about women;

c. Ms. Prenergast's comment about Plaintiff's clothing, which implied her attire was inappropriate due to her gender;

d. The repeated comments about Plaintiff's appearance and age, which disproportionately affect women in the workplace.

Am. Compl. at 15-16 (¶ 38).

The plaintiff alleges that about a week after she was given her performance evaluation, which she alleges was in retaliation for her complaints of racial discrimination, Parrott approached plaintiff's desk and loudly exclaimed, "Your vagina is hanging out." ¶ 22. This comment was made in front of a male colleague and could be overheard by others in the reception area. There is a connection between this comment and the plaintiff's sex. However, standing alone, it does not rise to the level of being

"very severe." <u>Alfano</u>, 294 F.3d at 374. However, while the comment was not physically threatening, a finder of fact could conclude that it was humiliating, as opposed to merely offensive.

As to Rentz, he contrasted the plaintiff's complexion to her daughter's complexion, and without any prior conversation about the plaintiff's personal life, "asked [the plaintiff] in a dismissive tone, 'how many baby daddies do you have?'" Am. Compl. ¶ 16. The circumstances suggest that there was a nexus between the plaintiff's sex and the alleged comment. Standing alone, the comment does not rise to the level of "very serious." <u>Alfano</u>, 294 F.3d at 374. But while there is no suggestion that the comment was physically threatening, a finder of fact could conclude that it was humiliating, as opposed to a mere offensive utterance.

As discussed above, the plaintiff provides no context for the alleged comment by Prenergast, "Why are you dressing like that?" Am. Compl. ¶ 13. The plaintiff simply asserts that the remark "implied that Ms. Merritt's clothing choices were inappropriate due to her age, race, and gender as an older woman of color." <u>Id.</u> But nothing about the remark itself suggests any connection to the plaintiff's sex. Thus, there is no basis for a conclusion that there is a nexus between this remark and the plaintiff's sex. In addition, this remark does not qualify as

one that is "very serious." <u>Alfano</u>, 294 F.3d at 374. Nor was the remark physically threatening or humiliating; there is no evidence to suggest that it was anything more than a mere offensive utterance.

The plaintiff alleges that unspecified people made unspecified comments about her appearance and age and provides no information about the context or circumstances surrounding such comments. Because the plaintiff provides no specific information about the comments, there is no basis for concluding that they related to her sex, nor any basis for concluding that they were very severe in nature or anything more than offensive utterances.

Thus, drawing inferences in the light most favorable to the plaintiff, the factual allegations in the complaint establish that there were two incidents related to the plaintiff's sex that were humiliating. One involved Parrot and the other involved Rentz. Neither incident standing alone rises to the level of being very serious. Nor do they rise to the level of being very serious when taken together. In addition, taken together, the two incidents are not sufficiently continuous and concerted that they can establish a pervasive environment; rather they are no more than episodic. <u>See</u> <u>Alfano</u>, 294 F.3d at 376.

### 3. Age-Based Hostile Work Environment

The plaintiff alleges that a hostile work environment because of her age, in violation of CFEPA (Count Five), was "evidenced by the following incidents":

> a. Ms. Crawford's inappropriate questioning about Plaintiff's age in the open reception area, which made Plaintiff feel uncomfortable and singled out due to her age;
>
> b. Ms. Parrott's comment "I can't believe you're that age!", which embarrassed Plaintiff and reinforced negative stereotypes about older women in the workplace;
>
> c. Ms. Prenergast's comment about Plaintiff's clothing, which implied her attire was inappropriate due to her age as an older woman.

Am. Compl. at 17-18 (¶ 37).

Although paragraph 37 of the Amended Complaint suggests that there were three incidents, there were only two incidents because the question by Crawford and the comment by Parrot were part of the same incident.

With respect to the incident involving Crawford and Parrot, the plaintiff alleges that Crawford asked the plaintiff about her age, and the plaintiff responded by telling Crawford her age. She alleges that Parrot overheard the exchange and remarked, "I can't believe you're that age." Each of these statements relates to the plaintiff's age, but there are no facts alleged that could support a conclusion that the incident could be termed "very serious." <u>Alfano</u>, 294 F.3d at 374. Nor are

there any facts alleged that could be the basis for concluding that the conduct was physically threatening or humiliating, as opposed to merely offensive.

Therefore, the motion to dismiss is being granted with respect to the hostile work environment claims. Because the plaintiff has not alleged facts and support a conclusion that a hostile work environment existed, the court does not reach the issue of whether a hostile work environment resulted in a constructive discharge.

### C. Disparate Treatment

"[A] 'disparate-treatment' claim [is] a claim that an employer intentionally treated a complainant less favorably than employees with the 'complainant's qualifications' but outside the complainant's protected class." Young v. United Parcel Serv., Inc., 575 U.S. 206, 212 (2015) (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). "[F]or a discrimination claim to survive a motion to dismiss, 'absent direct evidence of discrimination, what must be plausibly supported by facts alleged in the complaint is that the plaintiff [(1)] is a member of a protected class, [(2)] was qualified, [(3)] suffered an adverse employment action, and [(4)] has at least minimal support for the proposition that the employer was motivated by discriminatory intent.'" Buon v. Spindler, 65 F.4th 64, 79 (2d Cir. 2023) (alterations in

original) (quoting <u>Littlejohn v. City of New York</u>, 795 F.3d 297, 311 (2d Cir. 2015)).

With respect to the third element of a prima facie case, "[a] plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." <u>Joseph v. Leavitt</u>, 465 F.3d 87, 90 (2d Cir. 2006) (internal quotation marks omitted). Title VII requires a plaintiff to show "some 'disadvantageous' change in an employment term or condition." <u>Muldrow v. City of St. Louis, Missouri</u>, 601 U.S. 346, 354 (2024) (citations omitted). "This element may be satisfied by a showing of an actual or a constructive discharge." <u>Chertkova v. Connecticut Gen. Life Ins. Co.</u>, 92 F.3d 81, 87 (2d Cir. 1996). "Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." <u>Id.</u> (citing <u>Pena v. Brattleboro Retreat</u>, 702 F.2d 322, 325 (2d Cir. 1983)). "Working conditions are intolerable if they are 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" <u>Id.</u> at 89 (quoting <u>Lopez v. S.B. Thomas, Inc.</u>, 831 F.2d 1184, 1188 (2d Cir. 1987)). "A constructive discharge generally cannot be established, however, simply through evidence that an employee was dissatisfied with the nature of his assignments." <u>Stetson v.</u>

NYNEX Serv. Co., 995 F.2d 355, 360 (2d Cir. 1993). "Nor is it sufficient that the employee feels that the quality of his work has been unfairly criticized." Id. "Nor is the standard for constructive discharge merely whether the employee's working conditions were difficult or unpleasant." Id.

With respect to the fourth element of a prima facie case, "[a]n inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." Littlejohn, 795 F.3d at 312 (internal quotation marks omitted). "[T]o meet this minimal burden. . . . a plaintiff must plausibly allege that . . . his race, color, religion, sex, or national origin was a motivating factor in the employment decision." Vega, 801 F.3d at 85-86.

The plaintiff bases her disparate treatment claims in Count One through Count Five on the same allegations on which she bases her hostile work environment claims in the same counts. Thus, her race-based disparate treatment claim is based on paragraph 38 of Count One in the Amended Complaint; her sex-based disparate treatment claim is based on paragraph 38 of Count Three in the Amended Complaint; and her age-based disparate treatment claim is

based on paragraph 37 of Count Five in the Amended Complaint.

The defendant contends that the Amended Complaint does not contain factual allegations that could establish that any adverse action occurred under circumstances giving rise to an inference of discrimination on the basis of the plaintiff's race, sex, or age. The court agrees. Therefore, the court does not address the defendant's additional argument that the Amended Complaint fails to identify any adverse employment action the Commission took against the plaintiff.

The plaintiff appears to claim that she was subjected to two adverse employment actions, which each constituted a constructive discharge. Drawing inferences in the light most favorable to the plaintiff, the factual allegations in the Amended Complaint do not establish that either action occurred under circumstances giving rise to an inference of discrimination on the basis of the plaintiff's race, sex, or age.

The plaintiff alleges that "[a]s a result of this horrendous environment, Ms. Merritt was constructively discharged from her employment, and began taking PTO." Am. Compl. ¶ 24. What preceded the plaintiff taking paid time off was the incident in which Parrot approached Merrit's desk and loudly proclaimed, "Your vagina is hanging out!" Id. ¶ 22. On the same day that Parrot made that remark, the plaintiff

"reported the incident via email to Ms. Wanda Engermann, personnel officer[,] and to Alexis Cortez in HR." Id. ¶ 23. Thus, the plaintiff alleges that the cause of her constructive discharge was the work environment. However, as discussed above, what the plaintiff claims was a hostile work environment was due to conduct by her coworkers. None of the conduct in question was by anyone in a supervisory position or even in the human resources department. Thus, as discussed above, there are no factual allegations in the Amended Complaint which could show that any of the employees who allegedly engaged in hostile or discriminatory conduct had authority to take any tangible action against the plaintiff. There is no basis for imputing liability to the Commission.

In the paragraphs leading up to paragraph 35 of the Amended Complaint, the plaintiff alleges that after she exhausted her paid time off she took leave under the Family Medical Leave Act. She alleges that on October 7, she told human resources that she "could not return unless the discriminatory conditions of her employment were addressed. . . . HR never replied to Ms. Merritt's communication at all." Id. ¶ 26. The plaintiff alleges that on December 14, 2022, she emailed the human resources department and "asked to set up a meeting to discuss her unpaid leave that was coming to an end." Id. ¶ 27. She alleges that the human resources department responded that the plaintiff was

scheduled to return to work on December 20 and that if she wanted to extend her leave she had to submit documentation, which the plaintiff had already done. Id. ¶¶ 28-30. The Amended Complaint alleges that even though the plaintiff had submitted medical documentation, on December 15, "HR told Ms. Merritt that the extension was approved only to December 27, 2022, or she would need to resign." Id. ¶ 31. "Ms. Merritt was told by HR that her leave could not be extended further and that her only option was to send in a resignation, which would give her the option of reapplying to the State for employment, but not to the same position." Id. ¶ 32. The Amended Complaint alleges that the plaintiff was "experiencing debilitating stress, anxiety, and depression as a result of the hostile work environment . . . ." Id. ¶ 33. The Amended Complaint then alleges that "[a]s a result, Ms. Merritt was forced to resign from her employment." Id. ¶ 35. "Faced with the choice of returning to a discriminatory and hostile work environment that was causing her significant health issues or resigning, Ms. Merritt felt she had no choice." Id. ¶ 35.

Thus, the cause of this constructive discharge was the Commission's refusal to extend the plaintiff's leave until such time as the plaintiff felt the Commission had remedied what the plaintiff viewed as a hostile work environment. The only people to whom this refusal is attributable are people in the human

resources department. There is no allegation that anyone in the
human resources department criticized the plaintiff's
performance in ethnically degrading terms, made invidious
comments about others based on their race, sex, or age, or gave
more favorable treatment to employees who were not in a
protected group. Nor did anything similar to any such conduct
occur in the course of the events that led up to the plaintiff's
conclusion that she had no choice but to resign.

Therefore, the motion to dismiss is being granted with
respect to the plaintiff's disparate treatment claims in Counts
One through Five because she has not alleged facts that could
establish that any adverse action occurred under circumstances
giving rise to an inference of discrimination.

**IV. CONCLUSION**

For the reasons set forth above, the defendant's motion
[to] dismiss (ECF No. 33) is hereby GRANTED.

The Clerk shall enter judgment accordingly and close this
case.

It is so ordered.

Dated this 6th day of November 2025, at Hartford,
Connecticut.

_____<br>
/s/AWT<br>
Alvin W. Thompson<br>
United States District Judge